# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**ROBIN SEAVERS,**

     **Plaintiff,**

  v.         **Case No. 16-CV-996**

**CREE, INC.,**

     **Defendant.**

## REPORT AND RECOMMENDATION

### INTRODUCTION

Plaintiff Robin Seavers brought this action against defendant Cree, Inc., alleging claims for wrongful termination, breach of contract, and violation of the covenant of good faith and fair dealing. (ECF No. 1.) Cree has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). (ECF No. 24.) On June, 19, 2018, Judge Adelman, before whom the action is pending, referred Cree's motion to this court for a report and recommendation. (ECF No. 50.)

### FACTS

Headquartered in Durham, North Carolina, Cree designs and manufactures lighting-class LEDs, LED lighting, and semiconductor solutions for wireless power

applications. (ECF No. 34, ¶ 1.) Cree operates various research, technology, and development facilities nationally and internationally, including its manufacturing facility in Racine, Wisconsin. (*Id*., ¶ 2.) On December 15, 2014, Seavers signed an Offer of Employment to work as a Learning & Development Specialist at Cree's Racine facility. (*Id*., ¶¶ 3-4.)

On January 5, 2015, her first day of employment, Seavers signed two documents: (1) a document certifying that she received and understood Cree's Code of Conduct, and (2) a document acknowledging electronic access to Cree's policies, with which she agreed to read and comply. (ECF Nos. 27-9 and 27-10.) The latter document signed by Seavers states that "[t]he language used in Cree's policies is not intended to create a contract between Cree and any one or all of its employees and either I or the Company may terminate my employment at any time." (ECF No. 27-10.)

Among the policies that Seavers received and reviewed was Cree's Employment at Will Policy. (ECF No. 34, ¶ 9.) That policy states: "Continued employment is at the Company's and individual's discretion. Neither the Company nor employee is obligated to any specified term of employment." (ECF No. 27-7 at 3.) As part of that policy, "[a]ll employees, regardless of status or time with the Company, are 'at will' employees and are expected to meet and maintain standards of acceptable job performance and behavior. The Company reserves the right to dismiss any employee at any time for any reason that is not specifically prohibited by law." (*Id.*)

2

Cree's Code of Conduct Policy "describes standards of conduct for [Cree's] employees and directors in performing their duties for the Company[.]" (ECF No. 27-8 at 3.) It articulates the company's "core principles" by which Cree operates its business, including that everyone act honestly and ethically and obey all laws, rules and regulations. (*Id.*) The Code of Conduct states that any employee who becomes aware of a violation or suspected violation of the Code "should promptly report the matter to one of the Company's Compliance Contacts, through the Company's Compliance Hotline or to one of the Company's Compliance Committee members." (*Id.* at 4.) Seavers understood that if she believed there had been a violation of the Code of Conduct she was to report the violation in the manner set forth in the Code. (ECF No. 34, ¶ 13.) The Code also states that it is "not intended to create any express or implied contract with any employee or third party." (*Id.*)

Cree uses a Corrective and Preventative Action Reporting process to identify and address various areas for improvement in its internal processes and procedures. (ECF No. 34, ¶ 17.) Under this process, when the company identifies an area for improvement—such as training—it may assemble a Responsible Department Manager and team of employees to jointly develop a Corrective and Preventative Action Report (CAR). (*Id.*, ¶ 18.) A CAR is an internal document (that is, it is not provided to anyone outside of Cree) through which the responsible manager and his or her team may identify (1) the issue resulting in the need for a CAR, (2) the team assigned to address

3

it, (3) any necessary interim containment actions, (4) the root causes instigating the issue, and (5) the steps the team will take to correct it (that is, the "corrective action plan"). *(Id.*, ¶ 19.) The goal of the team assigned to a CAR is to identify the key (but not all) root causes that led to the identified issue. (Id., ¶ 20.)

Prior to Seavers' employment, Cree conducted an internal audit that identified a training gap for production workers at the Racine facility. (ECF No. 34, ¶ 25.) Cree instituted a CAR to address the internal training gap. (*Id.,* ¶ 26.) Through the corrective action plan identified in the CAR, Cree hoped to (1) develop a more effective method to identify internal training needs, complete internal training, and track internal qualification/certification status, (2) develop an internal requalification/recertification process, and (3) train temporary employees to the same standard as full-time employees. (*Id.,* ¶ 27.) Although Cree concluded that the CAR team had made progress toward its goals, it decided not to close the CAR, in part based on its finding that half of the Racine facility's assemblers who had been working for over 90 days had not been internally certified on the production lines. (Id., ¶¶ 28-30.)

On April 5, 2015, Seavers was transferred to the newly-created position of Manager of Learning and Development. (ECF No. 34, ¶ 31.) In that role, Seavers was primarily responsible for designing and implementing the technical training plan for production assemblers at Cree's Racine facility, including conducting new employee training and orientation and certifying assemblers on the various production lines. (*Id.*,

4

¶ 32.) She initially reported to Director of Operations Brian Dahmes. (ECF No. 34, ¶ 33.) After Dahmes left the company, from approximately July 1 through July 30, 2015, Seavers reported to Interim Director of Operations Scott Boyd. (*Id.*)

On April 14, 2015, the CAR regarding the training gap for production workers (CAR 1577-217) was closed and a new CAR (CAR 15019-217) was initiated so Cree could more easily track the initiatives taking place to address the production assembler internal training gap at the Racine facility. (ECF No. 34, ¶ 34.) The team assigned to develop and address CAR 15019-217 included Seavers (as the team leader), Dahmes (the department manager who was assigned responsibility for the approval and execution of the CAR), Regina Santoya, Nicole Polley and Adam Neibauer. (*Id.*, ¶ 35.) The issues CAR 15019-217 sought to address were the low percentage of assemblers that were certified for the lines that they were working on at the Racine facility and its impact on internal quality checks and customer complaints. (ECF No. 34, ¶ 36.) The team identified the following root causes leading to the internal certification issue: (1) assemblers moving lines frequently and the absence of a clearly defined plan regarding which assemblers to certify on which lines; (2) the lack of a minimum certification requirement; and (3) the lack of criteria for determining assignments to and scheduling of lines. (*Id.* at ¶ 37.) Seavers and her team began addressing these root causes and the internal goals identified in the CAR. (*Id.* at ¶¶ 39, 41.)

Following the initiation of CAR 15019-217, Seavers (or a member of her team) began providing weekly updates to Dahmes and Bruce Watson (Director of Quality for Cree), tracking the progress toward achieving the goals identified in the CAR. (ECF No. 34, ¶ 43.) The weekly updates showed that Cree was behind schedule in achieving the internal certification goals identified in the CAR. (*Id.*, ¶ 44.) Through these weekly updates, Seavers (or a member of her team) also identified obstacles preventing the team from timely achieving the internal goals identified in the CAR. (*Id.*, ¶ 46.) In these weekly updates Seavers never suggested that the April 2015 CAR contained false information, violated Cree's Code of Conduct, or was somehow unethical. (*Id.*, ¶ 48.)

Once Boyd became Interim Director of Operations he reviewed the April 2015 version of CAR 15019-217 and evaluated the team's progress toward accomplishing the goals identified. (ECF No. 34, ¶ 68.) From his review Boyd "concluded that Cree was consistently missing the internal targets laid out in the CAR." (*Id.*, ¶ 74.) Boyd, Margaret Chadwick (Human Resources Director for Cree) and Watson contend that they learned of and observed events which caused them to conclude that Seavers was not effectively collaborating with others or otherwise effectively performing the functions of her position. (ECF No. 26, ¶ 49.)

In April or May of 2015, Chadwick learned that one of Seavers' direct reports, Santoya, had concerns regarding her working relationship with Seavers. (ECF No. 34, ¶ 50.) Specifically, Santoya reported to Chadwick that Seavers was not listening to her and

not taking her input. (*Id.*) Chadwick met with both Seavers and Santoya to try to work through their issues. (*Id.*, ¶ 51.) From her observations at this meeting Chadwick contends that she concluded that Seavers did not demonstrate good teamwork; that is, that she did not listen well, she used her position of authority rather than her interpersonal skills to try to get what she wanted, and she failed to demonstrate empathy. (ECF No. 26, ¶ 52.) Seavers disputes that conclusion. (ECF No. 34, ¶ 52.)

In early 2015 Watson asked Seavers to provide team building training to his direct reports. (ECF No. 34, ¶ 54.) Following the completion of the first session, Watson received feedback from each of his direct reports involved in the training that the training session did not meet expectations and had not gone well. (*Id.*, ¶ 58.)

Boyd contends that he came to have concerns regarding Seavers' performance, including struggles to adhere to the training focus that he had articulated and not effectively collaborating with other team members. (ECF No. 34, ¶¶ 61-63.) Seavers contends that Boyd never communicated his concerns to her. (*Id.*)

On or about July 21, 2015, Boyd made the decision to revise the CAR by simplifying the correction action plan (Section 5 of the CAR) into one that the team could accomplish. (ECF No. 34,¶ 74.) Seavers and others assisted Boyd in reviewing and revising the April 2015 version of the CAR. (*Id.*, ¶ 75.)

On July 24, 2015, Seavers sent an email to Watson and Boyd in which she acknowledged that the team had not been successful under the prior version of CAR

7

15019-217, outlined her thoughts regarding why that CAR was not effective, acknowledged that a revised CAR had been developed, and discussed the new goals included in the revised CAR. (ECF No. 34, ¶ 84.) In her July 24, 2015 email, Seavers did not suggest that any information in any version of the CAR was false. (*Id.*, ¶ 86.) Nor did Seavers in her email request any changes to the root causes section of the CAR (section 4) or suggest that any changes were necessary. (*Id.*, ¶ 87.)

Boyd provided the finalized version of the revised CAR to Watson on the morning of July 28, 2015. (ECF No. 34, ¶ 95.) In the afternoon of July 28, 2015, Watson sent the revised CAR to Boyd, Seavers, and others and asked that they approve or reject it. (*Id.* at ¶ 96.) Seavers claims that she believed the revised CAR contained false statements in the root causes section and refused to approve it. (ECF No. 32 at ¶ 17.)

Specifically, Seavers believed the root causes section contained three false statements. The first allegedly false statement was, "'1. Due to assemblers moving lines frequently, many started training on at least 2 lines but never completed certification. a. A clearly defined plan regarding which assemblers to certify for what line was never established.'" (ECF No. 32, ¶ 18.) She says that she believed this statement to be false because an excel spreadsheet with names of employees and their training status was used and, in April 2015, specific names of people to be trained on specific lines was determined. (*Id.*)

The second allegedly false statement was, "'2. Certification was not used as a determining factor when scheduling lines. a. The current training matrix cannot be easily used [to] schedule lines based on certification status. b. A minimum certification requirement was not established'." (ECF No. 32, ¶ 19.) Seavers says that she believed this statement to be false because in the April 2015 CAR the plan included 80% minimum certification levels. (*Id.*)

The final allegedly false statement was, "'3. Assignments to lines have no criteria.'" (ECF No. 32, ¶ 20.) Seavers says that she believed this statement to be false because an internal audit from February 13, 2015, was to determine whether Certified Assemblers were on the production lines--which showed there was a criteria for assigning workers to the lines. (*Id.*)

On July 29, 2015, Seavers sent an email to Watson stating that she was "not able to approve this CAR as it does not include enough specifics to address shortcomings which prevented our success on the prior CARs for this issue." (ECF No. 34, ¶ 102.) After refusing to sign-off on the revised CAR, Seavers was told to go home for the afternoon. (ECF No. 34, ¶ 114.) On July 30, 2015, Cree terminated Seavers' employment. (*Id.*, ¶ 117.)

**SUMMARY JUDGMENT STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

9

matter of law." FED. R. CIV. P. 56(a). A fact is "material" only if it "might affect the outcome of the suit" and a dispute is "genuine" only if a reasonable finder of fact could return a verdict for the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). In resolving a motion for summary judgment, the court is to "construe all evidence and draw all reasonable inferences from the evidence" in favor of the non-movant. *E.Y. v. United States*, 758 F.3d 861, 863 (7th Cir. 2014) (citing *Gil v. Reed*, 535 F.3d 551, 556 (7th Cir. 2008); *Del Raso v. United States*, 244 F.3d 567, 570 (7th Cir. 2001)). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and [in] opposition to the motion for summary judgment." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016).

## ANALYSIS

### I. Wrongful Discharge

"Wisconsin has long recognized the employment-at-will doctrine." *Runzheimer Intern., Ltd. v. Friedlen*, 362 Wis. 2d 100, 119, 862 N.W.2d 879, 889 (2015). "Under the employment-at-will doctrine, an employer has the right to 'discharge an employee for good cause, for no cause, or even for cause morally wrong, without being thereby guilty of legal wrong.'" *Id.* (quoting *Brockmeyer v. Dun & Bradstreet*, 113 Wis. 2d 561, 567, 335 N.W.2d 834, 837 (1983) (internal quotations and citation omitted)).

The Wisconsin Supreme Court has recognized a narrow public policy exception to the employment-at-will doctrine. *See Brockmeyer*, 113 Wis. 2d at 572-77. Plaintiffs

10

seeking relief under this narrow exception must satisfy two steps. First, the plaintiff must "identify a fundamental and well defined public policy in their complaint sufficient to trigger the exception to the employment-at-will doctrine." *Strozinsky v. School Dist. of Brown Deer*, 23 Wis. 2d 19, 40, 614 N.W.2d 443, 453 (2000). A "fundamental and well-defined public policy" can be articulated by constitutional, statutory, or administrative provisions. *Id.* at 46 . Second, the plaintiff must "demonstrate that the discharge violated that fundamental and well defined public policy." *Id.* at 40. "Once the plaintiff satisfies these first two steps, the burden shifts to the employer to show that the discharge actually was sparked by just cause." *Id.* (citing *Winkelman v. Beloit Mem'l Hosp.*, 168 Wis. 2d 12, 24, 483 N.W.2d 211, 216 (1992)).

In her complaint Seavers' alleges that Cree's termination of her employment violated the public policy reflected in Wisconsin Stat. § 943.39 (ECF No. 1-1 at ¶ 25-26.), which states:

> **Fraudulent writings.** Whoever, with intent to injure or defraud, does any of the following is guilty of a Class H felony:
>
> (1) Being a director, officer, manager, agent, or employee of any corporation or limited liability company falsifies any record, account or other document belonging to that corporation or limited liability company by alteration, false entry or omission, or makes circulates or publishes any written statement regarding the corporation or limited liability company which he or she knows is false[.]

The Wisconsin Supreme Court has determined that Wis. Stat. § 943.39 reflects the fundamental and well-defined public policy of proscribing false reporting in business

dealings by deterring fraud by threat of punishment. *Strozinsky*, 23 Wis. 2d at 47; *see Slottke-Balistrieri v. Talgo, Inc.*, 2014 WL 1795128, at *13 (E.D. Wis. May 6, 2014). Cree does not dispute that Wis. Stat. § 943.39 sets forth a fundamental and well defined public policy sufficient to trigger an exception to the employment-at-will doctrine. But it sets forth a number of reasons why its termination of Seavers' employment does not trigger the exception.

Cree first argues that Seavers cannot prove that the CAR she was asked to approve (CAR 15019-217) was a "false" report. Specifically, it contends that, although Seavers and her team may have made progress in working to resolve the root causes of the production assembler training gap, that progress did not somehow render the identified root causes as set forth in the CAR at the time it was initiated in April 2015 "false." Further, what constitutes a "root cause" of the training gap is a matter of opinion and not a fact that can be true or false. (ECF No. 25 at 17-18.)

Secondly, Cree argues that the CAR was a purely internal document intended to be used to improve the company's performance. As such, no matter what it said, it could not have been used to deceive or defraud a third party—be it the government, a customer or another entity. Because it could not be used to perpetrate a fraud on anyone, "publication" of the CAR simply could not constitute a violation of Wis. Stat. § 943.39. (ECF No. 25 at 18-20.)

Lastly, Cree contends that, even if Seavers could prove that the CAR contained a false fact designed to perpetrate a fraud on some third party, Cree did not terminate her employment for refusing to approve it. Rather, Cree decided to let Seavers go because she engaged in a pattern of behavior in which she was neither collaborative nor effective in achieving the Racine facility's training goals. (ECF No. 25 at 20-21.)

In response, Seavers contends that whether the CAR at issue was a "false report" "is a material fact remaining in dispute." (ECF No. 31 at 5.) Seavers further contends that Wis. Stat. § 943.39 applies even to documents intended for wholly-internal purposes; no intent to defraud a third party need be demonstrated. (*Id.* at 5-7.) She argues that any falsification of documents in business is a violation of public policy that would support a wrongful discharge claim. Finally, with regard to the reason for her discharge, she argues that "a reasonable jury could find for Ms. Seavers on the issue of whether or not she fulfilled her legal obligation to defy [Cree's] instructions." (*Id*. at 10.)

Wis. Stat. § 943.39 states, "Whoever, with intent to injure or defraud, does any of the following…." The clear purpose of the statute, as acknowledged by Seavers' Complaint, is to "deter[] fraud by threat of punishment." (ECF No. 1-1, ¶ 25.) Indeed, in her complaint Seavers contends that her employment was terminated "because she refused to participate in Cree's fraudulent conduct in violation of the clear mandates of public policy established by § 943.39. Wis. Stats." (*Id.*, ¶ 26.) Thus, the question is

whether a genuine dispute of material fact exists as to whether any allegedly false statement contained in CAR 15019-217 could be used to defraud someone.

CAR 15019-217 states that the problem it was addressing was "[t]he low percentage of assemblers that are certified for the lines that they are working on in the Racine facility[,]" which was contributing to a "high rate of customer complaints." (ECF No. 27-12 at 1.) Seavers does not dispute that CAR 15019-217 was to be used for wholly internal purposes—namely, to increase the percentage of assemblers that are certified. At her deposition Seavers confirmed that the certification goals were exclusively internal goals for the company; no law required a certain number of assemblers be certified. (ECF No. 35-3 at 33.)

Seavers also admits that the root causes of the certification problem identified on April 14, 2015, were accurate. (ECF No. 34, ¶ 39.) The fact that Seavers believed that her team was "in the process of addressing those issues" did not render the root causes as originally identified untrue—certainly not untrue in a way that would violate Wis. Stat. § 943.39.

Having said that, for purposes of summary judgment the court accepts that the statements in CAR 15019-217 which Seavers alleges were false (the root causes of the assembler certification problem) were, in fact, false. Seavers has not explained how any of them could be used to commit a fraud on anyone, or what motive there would be to commit a fraud.

14

Seavers has not identified a genuine dispute of material fact that exists relating to whether her discharge violated the public policy reflected in Wis. Stat. § 943.39. The letter and spirit of Wis. Stat. § 943.39 is to deter fraud. The statements Seavers' alleges were false in the revised version of CAR 15019-217 could not be used to commit a fraud.

As such, the court recommends granting Cree's motion for summary judgment on Seavers' wrongful discharge claim.

## II. Breach of Contract

The second claim in Seavers' complaint alleges that Cree breached a contract with her. (ECF No. 1-1, ¶¶ 33-34.) Specifically, it alleges that Cree breached the Code of Conduct, causing Seavers to suffer "a loss of the benefits of her bargain." (*Id.*, ¶ 34.)

In moving for summary judgment on Seavers' breach of contract claim, Cree contends that Seavers was an employee at will whose employment could be terminated at any time for any reason, with or without cause. (ECF No. 25 at 22-25.) The Code of Conduct did not alter that at-will employment relationship. (*Id.*) Even if it did, Cree argues, Seavers cannot demonstrate that Cree breached it. (*Id.* at 25-27.)

In response, Seavers argues that the Code of Conduct was an agreement between Cree and Seavers that imposed certain obligations on the parties, including that Seavers report any violations of the Code of Conduct. In exchange, Cree agreed not to terminate Seavers for reporting such violations. To the extent any dispute exists about whether the Code of Conduct created a contract, or whether Cree breached that contract by

15

terminating Seavers' employment, those are fact questions for the jury. (ECF No. 31 at 20-24.)

"Wisconsin has a strong presumption in favor of employment at-will." *Thelen v. Marc's Big Boy Corp.*, 64 F.3d 264, 269 (7th Cir. 1995) (citing *Forrer v. Sears, Roebuck & Co.*, 36 Wis. 2d 388, 393, 153 N.W.2d 587, 589-90 (1967)). "To overcome this presumption, a plaintiff must show that both parties intended to restrict the reasons for which an employee could be discharged." *Thelen*, 64 F.3d at 269 (citing *Forrer*, 36 Wis. 2d at 393). An at-will contract may be modified by an employee manual or handbook. *See Ferraro v. Koelsch*, 124 Wis. 2d 154, 169-70, 368 N.W.2d 666, 674 (1985). An employment manual or handbook, however, "may alter an at-will employment relationship *only* if the manual contains express provisions from which it reasonably could be inferred that the parties intended to bind each other to a different relationship." *Bantz v. Montgomery Estates, Inc.*, 163 Wis. 2d 973, 979, 473 N.W.2d 506, 508 (Ct. App. 1991) (emphasis added).

At the onset of her employment with Cree Seavers repeatedly acknowledged that she was an at-will employee. A provision in Seavers' Offer of Employment reads, "Please understand that neither this letter nor the agreement constitutes a commitment by the Company to employ you for any specific term. Either you or the Company may terminate the employment relationship at any time, with or without case." (ECF No. 27-6 at 2.) Language in an acknowledgement form that Seavers' signed on her first day of work reads, "The language used in Cree's policies is not intended to create a contract

16

between Cree and any one or all of its employees and either I or the Company may terminate my employment at any time." (ECF No. 27-10.) Among the policies that Seavers' agreed to comply with is a policy titled "Employment at Will," which reads in relevant part:

> All employees, regardless of status or time with the Company, are 'at will' employees and are expected to meet and maintain standards of acceptable job performance and behavior. The Company reserves the right to dismiss any employee at any time for any reason that is not specifically prohibited by law.

(ECF No. 35-9 at 12; *see* ECF No. 27-10.) As to Seavers' argument that the employment relationship was converted from one at will to one of express contract by virtue of Cree's Code of Conduct, the Code expressly disclaims the existence of a contract: "The Code is not intended to create any express or implied contract with any employee or third party." (ECF No. 1-1 at 12; *see Bantz*, 163 Wis. 2d at 981.)

As stated above, although an employer may modify the at-will nature of its employment relationship with its employees through commitments contained in an employment manual, the manual must contain express provisions from which it reasonably could be inferred that the parties intended to bind each other to a different relationship. *See, e.g.*, *Bantz*, 163 Wis. 2d at 979. Not only does the Code of Conduct contain no such provisions, it expressly disclaims any such intent. Therefore, it cannot reasonably be inferred that the parties intended to bind each other to an employment relationship that was other than one at will.

As such, the court recommends granting Cree's motion for summary judgment as to Seavers' breach of contract claim.

**III.     Violation of Covenant of Good Faith and Fair Dealing**

Seavers' last claim alleges that Cree breached its duty of good faith and fair dealing "in the performance of its business dealings and the fulfillment of its Code of Conduct with [her]." (ECF No. 1-1, ¶¶ 36-37.) In seeking summary judgment on this claim, Cree contends that, as discussed above, Seavers was an at-will employee. As such, Cree owed her no duty to terminate her employment in good faith. (ECF No. 25 at 27-28.)

Premised upon its position that the Code of Conduct created a contract between the parties, Seavers' response essentially ignores the authority upon which Cree's motion is based. Since, according to Seavers, the parties *did* have a contract, it carried with it (as do all contracts under Wisconsin law) an implied covenant of good faith and fair dealing. And Cree breached that covenant when it terminated Seavers' employment for reporting violations of the Code of Conduct. (ECF No. 31 at 25-30.)

The Wisconsin Supreme Court has declined to impose a duty to terminate in good faith into an employment at will contract. *Brockmeyer*, 113 Wis. 2d at 569; *Bammert v. Don's Super Valu, Inc.*, 254 Wis. 2d 347, 354, 646 N.W.2d 365, 368 (2002); *Scarpace v. Sears, Roebuck & Co.*, 113 Wis. 2d 608, 609, 335 N.W.2d 844, 845 (1983). Since the court has concluded that Seavers' remained an at-will employee at the time of her

termination, Seavers' good faith and fair dealing claim fails. Thus, the court recommends that Cree's motion for summary judgment as to Seavers' third claim be granted.

**IT IS THEREFORE RECOMMENDED** that the defendant's motion for summary judgment (ECF No. 24) be **granted**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C) and Fed. R. Civ. P. 72(b)(2) whereby written objections to any recommendation herein or part thereof may be filed within fourteen days of service of this recommendation. Failure to file a timely objection with the district court shall result in a waiver of your right to appeal.

Dated at Milwaukee, Wisconsin this 16th day of August, 2018.

_William E. Duffin_
WILLIAM E. DUFFIN
U.S. Magistrate Judge